UNITED STATES of America, Plaintiff,

v.

AMERICAN CYANAMID COMPANY, Defendant.

No. 60. Civ. 3857–CLB.

United States District Court, S.D. New York.

Jan. 10, 1983.

U.S. Dept. of Justice, Antitrust Div. for U.S. Government.

Donovan, Leisure, Newton & Irvine, New York City, for American Cyanamid.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for intervenor Dart Industries, Inc.

Howrey & Simon, Washington, D.C., for intervenor Melamine Chemicals Inc.

Thompson & Knight, Dallas, Tex., for amicus curiae Plastics Mfg. Co.

## MEMORANDUM DECISION

### Termination of Consent Decree

BRIEANT, District Judge.

Pursuant to Rule 60(b)(5) and (6) of the F.R.Civ.P. and Provision XV of the Consent Decree in this civil antitrust action made August 4, 1964 by the late Hon. Richard H. Levet of this Court, defendant American Cyanamid Company ("Cyanamid"), with the consent of plaintiff United States Government ("Government"), moves to terminate all provisions of the aforesaid decree or judgment which now remain in effect.

Intervenors Melamine Chemicals Inc. ("MCI"), a producer of melamine, and Dart Industries ("Dart"), a plastic laminate producer which consumes melamine, along with *amicus curiae* Plastics Manufacturing Company, a producer of plastic laminates and melamine resins, oppose such termination, contending that an anticompetitive impact on the melamine and melamine related industries will result.

Melamine is a fine white crystalline powder which is used in the manufacture of resins which in turn are used for high-pressure laminates, such as "Formica" a well-known trade-marked product manufactured by a division of Cyanamid, as well as artificial chinaware, plastic parts for the automobile industry and coatings for textile and paper products. A study in 1982 by the United States International Trade Commission (Inv. No. 731–TA–107–Prelim. "Melamine From Brazil") reports that United States consumption of melamine resins in 1981 by end uses is estimated as follows: high-pressure laminates, such as "Formica", 29% of the total; surface coatings, 23%; molding compounds, 16%; paper treating and paper coating, 15%; textile treating and textile coating, 5%; and other (including adhesives), 12%. Typical of the uses of high-pressure laminates are decorative countertops, furniture and cabinet panels, tabletops, and partitions in commercial buildings. More than 80% of all melamine molding compounds are consumed in the manufacture of dinnerware which varies in quality from picnic disposables to advanced products which compete with fine chinaware.

Shortly following the entry of the Consent Decree there were four domestic producers of melamine, including Cyanamid and Fisher Chemical Co., the predecessor of MCI. Now, and since 1979, there are only two domestic producers, MCI and Cyanamid. There are now 17 melamine producers outside the United States, six in Western Europe, three in Eastern Europe and the U.S.S.R., three in Japan, and one each in Brazil, India, Kuwait, Taiwan and the Republic of Korea. World production capacity in 1982, by regions, is estimated by the United States Department of Commerce as follows:

| Region | Production Capacity |
|---|---|
| Western Europe | 40% |
| Japan | 23% |
| United States | 15% |
| Eastern Europe and the U.S.S.R. | 12% |
| Brazil | 2% |
| Other countries | 8% |
| TOTAL | 100% |

Total world capacity to produce melamine increased from 886 million pounds in 1979 to 981 million pounds in 1982, or by 11%. The People's Republic of China is expected to open a melamine plant with annual capacity of 26 million pounds by the end of 1983.

Melamine is essentially a fungible intermediate chemical. There is no distinctive difference in quality or chemical content according to plant or country of origin. Its production is capital intensive; increased put-through in an operating plant does not increase the labor costs and the chemical reaction proceeds on a continuous flow process much the same as that of an oil refinery. Such a product should be expected to sell at a competitive price having a long term relation to the marginal costs of the least efficient producer.

The complaint in this civil antitrust action was filed October 5, 1960 against Cyanamid and alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18. The complaint charged that

Cyanamid unlawfully allocated and monopolized the foreign and domestic melamine and melamine-contained markets through its leadership of an international cartel of melamine producers, its exclusive control and manipulation of melamine technology and "Dicy," (described *infra*), and by its acquisition in 1956 of Formica, Inc., then and now the principal domestic user of melamine crystals for the production of high pressure laminates.

As a result of these alleged violations, the Government alleged that the price of melamine and melamine-contained products was unreasonably high, the available supply of melamine unreasonably low, actual competition in the melamine and melamine related industries lessened, and the potential emergence of new competitors in those industries effectively foreclosed.

The litigation was settled by entry of the Consent Decree referred to above. Since that time, the Consent Decree has been the subject of various proceedings before this Court, familiarity with which is assumed. In 1969, 1973 and 1974, the Court modified various provisions of the Consent Decree at the request of Cyanamid and with the consent of the Government. In 1975, the Government initiated criminal contempt proceedings against Cyanamid alleging that Cyanamid in 1972 had wilfully violated the Consent Decree's maximum melamine production level. This Court, after a trial found Cyanamid not guilty of a criminal contempt. *United States v. American Cyanamid Co.,* 1978–1 Trade Cas. ¶ 61,843 (S.D.N.Y.1977). See also, *Stamicarbon, N.V. v. American Cyanamid Co.,* 506 F.2d 532 (2d Cir.1974).

The Consent Decree itself was formulated so as to dissolve Cyanamid's monopoly of the United States melamine industry and encourage the entrance of new producers into the domestic melamine market. A brief review of its provisions may be of assistance to the reader.

The first two provisions of the Consent Decree established the Court's jurisdiction over this controversy and defined the terminology employed in the Decree. Provision III identified the parties and entities bound by the Consent Decree.

Provision IV directed Cyanamid to divest itself of its melamine plant in Willow Island, West Virginia, within two years of the entry date of the Decree. This was done, by sale to MCI's predecessor. Cyanamid was also directed to guarantee Willow Island's purchaser access to its employees, customer lists and technology for one year following the purchase of the plant. Finally, if requested by the purchaser of Willow Island, Cyanamid was required to purchase 50% of its melamine requirements in excess of its own melamine production at the prevailing market price for melamine produced in the United States for a maximum term of ten years.

Provision V of the Decree, now expired, in effect prohibited Cyanamid for a ten year period, from producing more than 30 million pounds of melamine per year in the United States or to expand its domestic production capacity beyond that amount until other domestic melamine producers increased their production capacity by 25 million pounds.[1]

Provision VI enjoins Cyanamid from: (1) entering into or maintaining an agreement to allocate or divide customers, territories or markets for the sale, manufacture or distribution of melamine or melamine-contained products; (2) eliminating, limiting or restraining competition in these products; (3) limiting or restraining the importation or exportation of these products; and (4) refusing to do business with any person engaged in the sale, use or manufacture of

---

1. The Court modified this provision on three separate occasions, each time with the consent of the Government. In 1969, the Court permitted Cyanamid to build its present urea process plant in Fortier, Louisiana, in response to the technological advance, discussed beginning at p. 8 of the text, which enabled melamine to be produced more economically from the raw material urea. In 1973, and again in 1974, the Court authorized Cyanamid to increase this plant's production capacity in light of a severe temporary worldwide melamine shortage which occurred in those years.

melamine or melamine-contained products. This provision is still in effect.

Provision VII prohibits Cyanamid from: (1) referring melamine business to any company identified as a co-conspirator in the original complaint, or to any other company in the melamine business; (2) from entering into an agency or distributorship relationship with any such company; or (3) from attempting to prevent or restrict any company from entering or participating in the melamine business. At present, this provision is arguably obsolete, at least as to domestic producers, since the named co-conspirators and the then existing melamine producing companies are no longer involved in melamine production.

Provision VIII currently prohibits Cyanamid from refusing to sell melamine to any individual willing and financially able to pay the going market price and forbids Cyanamid from establishing price differentials between Dicy and Melamine for the purpose of, or which would result in, restraining trade in melamine or melamine resins in the United States. This latter provision is now technologically obsolete. See *infra*, pp. 365–366.

Provision IX is still operative and orders Cyanamid to grant to any party so requesting, a nonexclusive, unrestricted license under all its existing urea, Dicy and melamine patents and to all future patents concerning the production, use and sale of melamine resin. This provision also regulated Cyanamid's acquisition of any new patents for a five year period which expired in August of 1969.

Provision X directed Cyanamid for a ten year period to furnish, upon request, all its technical information relating to the commercial manufacture of Dicy, melamine and melamine resins. This provision has been fully complied with and expired in 1974.

Provision XI, the sole present source of discord in this litigation, appears by its terms to operate in perpetuity, subject only to defeasance after ten years upon application to the Court as therein contemplated. It reads in relevant part as follows:

"(A) ... Cyanamid is ordered and directed to purchase annually from other producers of melamine (with the preference to United States producers) an amount of melamine equivalent to the requirements of Cyanamid for melamine for use by Cyanamid in the production of laminates in the United States provided that at any time after ten (10) years from such date, Cyanamid may petition to this Court to be relieved from this provision, such relief to be granted upon a showing by Cyanamid to the satisfaction of this Court that the effect of such relief will not be substantially to lessen competition or tend to create a monopoly in any line of commerce in any section of the country. Cyanamid's requirements for the purposes of this Section XI shall be deemed to be an amount of melamine of all grades, but not superior to that customarily used by Cyanamid in the manufacture of laminates, at least equivalent to the amount of such melamine used by Cyanamid in its production of laminates during the preceding calendar year.

\* \* \* \* \* \*

(C) In the event Cyanamid considers that the melamine price offered for its purchase pursuant to subsection (A) hereof is oppressively high, Cyanamid may apply to the Court, and upon a showing by Cyanamid to the satisfaction of this Court that the price is noncompetitive, the Court may grant such protective order as the Court deems appropriate."

Provision XII required Cyanamid to publish notice of the final consent judgment and its obligations thereunder.

Provision XIII, presently in effect through 1984, prohibits Cyanamid from acquiring certain melamine-related businesses within North America without the consent of the Government or permission of the Court. However, Cyanamid may acquire melamine-related businesses located outside North America following prompt notice to the Government.

Provision XIV authorizes the Government, upon written request and reasonable notice, to examine Cyanamid's books and

records in order to secure its compliance with the Consent Decree.

Finally, by Provision XV the Court retains jurisdiction in order to enable Cyanamid and the Government to seek enforcement, modification or termination of the Consent Decree's provisions.

Since the Consent Decree was entered, profound and complex changes have taken place in the melamine production industry.

There are now two basic commercial processes for producing melamine: (1) the urea process; and (2) the Dicyandiamide or "Dicy" process. In 1964 there was only one process, that using "Dicy." Today, virtually all melamine produced worldwide utilizes the newer and more economical urea process. The advantages of the urea process include lower production costs, more readily available raw materials and recyclable by-products. A third process using hydrogen cyanide has been patented but not used. Both domestic producers of melamine now employ the urea-based technology licensed from Stamicarbon N.V. of the Netherlands.

The Stamicarbon process is most economical when used in conjunction with urea manufacture, permitting the off gases to be recycled. With the recycle step (which both U.S. producers employ), the quantity of urea necessary to produce one pound of melamine is reduced by about 50%. The melamine vapor is separated, cooled to a liquid, filtered, recovered by crystallization, centrifuged, dried, pulverized and stored for shipment.

However, before the Stamicarbon process came on stream, and prior to the commencement of this lawsuit, melamine was produced solely from Dicy. Cyanamid controlled the domestic price and supply of Dicy through the ownership and operation of the only Dicy production plant located in North America. By virtue of its dominance of the domestic Dicy industry, Cyanamid allegedly became an influential member of an international cartel of melamine producers, which controlled the worldwide price and supply of melamine, and allegedly allocated markets, restricting the importation of foreign melamine into the United States. In addition, Cyanamid controlled the publication and use of melamine technology through its numerous Dicy and melamine related patents. Finally, in 1956, Cyanamid acquired Formica, Inc., the leading producer of plastic laminates and a substantial consumer of melamine, thereby obtaining the questionable benefits of vertical integration.

Cyanamid and the Government now contend that the surviving provisions of the Consent Decree should be terminated since it is no longer required to ensure a competitive melamine market. They assert that fundamental changes in the industry, specifically the industry's conversion from Dicy based melamine production to the use of urea as a feedstock to produce melamine and the emergence of non-cartelized foreign competitors as an alternative source of competitive melamine supply for the United States market, considered in light of the attendant decline of Cyanamid's share of the domestic merchant market, warrant termination of the Consent Decree.[2]

The source of dispute in this litigation is so much of the agreement between the Government and Cyanamid which would terminate Provision XI of the Consent Decree, quoted *supra*, p. 365, providing for compulsory purchase of melamine by Cyanamid on the merchant market for its Formica division. No opposition has been raised against termination of the remaining portions of the Decree. Accordingly, since it appears obvious that the remaining portions of the Consent Decree should be terminated, and because the Government consents thereto, we will confine our discussion to Provision XI.

Since MCI is now the only other producer of melamine in the United States, it is now the sole beneficiary of the requirement that

---

**2.** As used herein, the merchant market comprises all sales in the United States of melamine in its crystal or powdered form for use as a raw material by the vendee, which sales are arms-length transactions between unrelated parties. It does not include "sales" by Cyanamid to any of its operating divisions or profit centers.

Cyanamid make annual purchases in amounts equal to Formica's requirements for plastic laminate production in the preceding year. It receives substantial revenue and has been able to achieve considerable corporate growth as a result of this semi-captive customer.[3] However, Dart and the *amicus* also assert that they enjoy a continuing and direct benefit from this provision of the Consent Decree. See *infra,* p. 368, *et seq.*

The Government and Cyanamid now assert that Provision XI operates against the public interest and contrary to antitrust policy because it increases Cyanamid's cost of doing business unjustifiably, thereby increasing the consumer price of Cyanamid's Formica products. The Government contends that, at best, Provision XI now operates merely as a transfer of profits from Cyanamid to MCI, and that MCI, now the largest domestic melamine producer, should no longer require continued benefit from the Decree.

Cyanamid and the Government contend, and the Court agrees, that since the Government has consented to termination, Cyanamid need only show the Court that termination is in the public interest.

■ The intervenors now contend that, in order to justify termination, Cyanamid must comply with the higher standard of proof contained in Provision XI of the Consent Decree and show that termination "will not ... substantially ... lessen competition or tend to create a monopoly in any line of commerce in any section of the country." This Court rejects that contention. Provision XI represents an alternative basis or evidentiary standard adopted by the parties with the consent of the Court, by which the Decree could be vacated or modified after a hearing, without the consent of the Government. It is clear that where the Government does not consent to termination or modification of an antitrust consent judgment, the proponent of termination must show that the market changes said to justify termination "are so important, that [the] dangers, once substantial, have become attenuated to a shadow." *United States v. Swift & Co.,* 286 U.S. 106, 107, 117, 52 S.Ct. 460, 463, 76 L.Ed. 999 (1931).

■ However, where as here the Government *consents* to the proposed termination, the proponent of termination need show merely that termination of the Decree is "in the public's interest." *United States v. Swift & Co.,* 1975–1 Trade Cas. ¶ 60,201, ¶ 65,702 (N.D.Ill.1975); see also *United States v. General Electric Co.,* 1977–2 Trade Cas. ¶ 61,659, ¶ 72,717 (E.D.Pa.1977).

---

**3.** It seems apparent that the course of dealing between Cyanamid and MCI has resulted in the purchase by Cyanamid from MCI of melamine at premium, full list, or non-discounted prices. Under the Consent Decree, Cyanamid is not required to prefer United States producers of which MCI is now the only one, if there is a significant price differential, and also may apply to the Court under Provision XI(C) for relief if the domestic melamine is regarded as priced "oppressively high." This latter Provision XI(C) has never been availed of by Cyanamid. The only practical limitation on MCI's price is that created by the competing merchant sales of Cyanamid itself, and the importers of foreign melamine.

Cyanamid argues that MCI has limited Cyanamid's access to foreign melamine by an aggressive policy of filing complaints with the United States International Trade Commission of the Department of Commerce, charging that it is being injured by imports of melamine from foreign countries sold at less than fair value ("LTFV"). There was nothing inappropriate about MCI's activities in this regard. It did succeed in obtaining a finding of fact from the Commission that Japan was selling melamine in the United States at LTFV. See "Melamine in Crystal Form from Japan" (Inv. No. AA–1921–162) U.S. ITC Publication 796, December 1976. A dumping order concerning melamine from Japan was published on February 2, 1977. 42 Fed.Reg. 6866. No imports of melamine have come from Japan to the United States since then.

MCI also attacked melamine imported from the Netherlands, Austria, Italy and Brazil, on the same grounds, precipitating separate investigations with respect to each. In none of these proceedings was MCI successful in persuading the Commission that melamine was being sold in the United States at LTFV. There is no doubt that the expense of defending such proceedings tends to chill the ardor of potential importers of melamine. However, the Court must assume that the proceedings were decided correctly, and that MCI was within its rights in filing them. As noted, Cyanamid has never availed itself of Provision XI(C) of the Decree.

The position of the intervenor parties on the subject of termination of Provision XI are different. MCI contends that the semi-compulsory annual sales it makes to the Formica division of Cyanamid pursuant to Provision XI are vital to its continued existence, and that termination of the Consent Decree will end these sales and effectively force it out of business. This "will substantially lessen competition and ... tend to create a monopoly [in Cyanamid]." (MCI's Memorandum in Opposition to Cyanamid's Motion to Terminate, p. 3).

Dart's analysis and that of the *amicus* Plastics Manufacturing Company ("PMC") are affected by their position as users of melamine crystals. Dart, through its Ralph Wilson Plastics Division, produces plastic laminates from melamine crystals in principal competition with Cyanamid's Formica division. Producers and users of plastic laminates such as Dart and the *amicus* PMC are directly affected by any change in supply, demand or price in melamine crystal merchant market. Since Cyanamid and MCI are now the only domestic suppliers of melamine crystals, Dart and PMC contend that termination of the Consent Decree will have an anticompetitive impact on the plastic laminate industry. They contend this is so because its own perceived economic self-interest will cause Cyanamid to withdraw completely from the melamine crystal merchant market, so as to be able to use its entire melamine production capacity internally to meet the production demands of its Formica division. Dart and PMC also claim that foreign melamine producers are not reliable sources for melamine crystals and

have little competitive influence on the domestic market.[4]

As a result of Cyanamid's assumed or supposed intention to withdraw from the merchant melamine crystal market, and the claimed absence of reliable and adequate foreign suppliers, Dart alleges that *MCI* will inherit a monopolistic position in the merchant melamine crystal market. Melamine resin producers, on whom Dart and PMC rely, will be forced, it is said, "to pay monopolistic, anti-competitive prices for raw and intermediate materials [melamine crystals]." (Affidavit of Ralph Wilson, sworn to October 20, 1982). When this cost increase is passed on to plastic laminate producers, they will "be unable to compete in the manufacture and marketing of plastic laminates and related materials with Cyanamid, which by virtue of ... [its ownership of Formica] will be able to price squeeze competitors out of that line of commerce." (Affidavit of Ralph Wilson, sworn to Oct. 20, 1982, p. 3).

We dispose of the arguments of Dart and PMC first because their invalidity seems clear and amenable to simple exposition.

First, contrary to the contentions of Dart and PMC, termination will not enable MCI to acquire or inherit a monopolistic position in the merchant melamine crystal market. If sound economic considerations should prompt Cyanamid to withdraw from the merchant melamine market, foreign producers should be expected to compete with MCI for the merchant melamine market demand previously satisfied by Cyanamid.[5]

4. Cyanamid cites MCI's vigorous anti-dumping campaign against foreign melamine producers. Foreign suppliers are said to be unwilling to risk the expense and exposure of anti-dumping proceedings in order to offer melamine crystals at competitive prices to domestic purchasers. There is little evidentiary basis to support this conclusion.

5. As we previously observed, melamine is fungible, and no good will or significant quality differential attaches to the manufacturer's brand. During 1982, approximately 33% of the merchant market demand for melamine crystals (excluding the demand of Formica division of Cyanamid) was satisfied by imported crys-

tals. (Affidavit of Scotty B. Patrick, sworn to December 8, 1982, ¶ 5). Such statistics are not indicative of a permanent pattern because of world-wide price fluctuations in the sources of constituent raw materials such as natural gas and the effect of currency fluctuations in producing countries. Furthermore, it is a characteristic of the method of melamine production used by Cyanamid and MCI that lengthy plant failures may occur without warning. In 1981, MCI and Cyanamid experienced simultaneous plant shutdowns. On this occasion, foreign producers of melamine supplied the domestic market demand to the total exclusion of American producers, *increasing total melamine imports from 13.7 million pounds in 1980 to 29.4*

Nor is it reasonable to assume that Cyanamid would withdraw from merchant sales. This assertion is both speculative and contrary to contemporary economic theory.

▇ Corporate vertical integration is not, in and of itself, a violation of the antitrust laws. *Fruehauf Corp. v. F.T.C.,* 603 F.2d 345 (2d Cir.1979). Under *Fruehauf,* vertical integration is not an antitrust violation unless it can be shown clearly that it will have a "probable anticompetitive impact" upon the relevant industry. *Fruehauf, supra,* at 353. The "mere possibility" that such a result might occur is an insufficient basis for an antitrust violation or justification for the perpetual existence of this Decree. *Fruehauf, supra,* at 351, citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 323, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962); *BOC International Ltd. v. F.T.C.,* 557 F.2d 24, 28 (2d Cir.1977); *Crown Zellerbach Corp. v. F.T.C.,* 296 F.2d 800, 824–25 (9th Cir.1961), *cert. denied,* 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962); *United States v. Atlantic Richfield Co.,* 297 F.Supp. 1061, 1066 (S.D.N.Y.1969), *aff'd sub nom. Bartlett v. United States,* 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971).

Contemporary economic theory recognizes that vertical integration may foster corporate efficiency and *enhance* competition in the market place. Yale Brozen, former consultant to the Justice Department's Antitrust Division, and currently Professor of Economics at the University of Chicago, states:

"Vertical mergers produce no anticompetitive effects. Preventing them in the name of preventing 'foreclosure' simply prevents the use of the cheapest method of obtaining the efficiencies of vertical integration. Hostility to such mergers may cause waste of the existing capital stock, redundant capacity, and the misallocation of current capital supplies as preventing horizontal mergers did in the brewing industry. Also, where a firm buys from a non-competitive set of suppliers with excess capacity, earning little because of the excess in spite of a non-competitive price, acquisition of a supplier will be cheaper than building new facilities and will avoid wasting the economy's limited supply of capital. Such an acquisition, by decreasing cost to the buyer, may then force competition into the supplying industry by the buyer's competition with others in his industry and their defensive reactions. Vertical mergers, in this case are pro-competitive." Yale Brozen, Concentration, Mergers and Public Policy, at 402–03 (1982).

A rational division manager operating Cyanamid's melamine crystal production facility will continue to sell the merchant crystal market, at market prices, whenever the market price equals or exceeds the marginal unit cost. Since Cyanamid has a large and recently erected facility, and since economies of scale in melamine production are very great, such a unit cost should exist whenever it is feasible for Cyanamid to operate its plant at all. Furthermore a rational division manager operating Cyanamid's Formica division has no economic motivation to "buy" the crystals from a sister division if they can be acquired cheaper overseas or from MCI.[6] This Court and the antitrust laws may expect rational conduct economically motivated.

million pounds in 1981. (Affidavit of Robert P. Kreahling, sworn to October 27, 1982, Ex. 8). This response clearly manifests foreign producers' ability and desire to compete in the domestic melamine market when economically feasible to do so.

**6.** Consistent with the economic concept of man as a "rationale maximizer of his self-interest," an individual will alter the operation of his business in response to economic changes in his surroundings if it is profitable to do so. Richard A. Posner, Economic Analysis of Law, at 3 (2d ed. 1977).

Industrial production is also governed by this course of conduct. "How things are produced is determined by the competition of different producers. The method [or raw material] that is the cheapest at any one time, because of both physical efficiency and cost efficiency, will displace a more costly method [or raw material]. The only way for producers to meet price competition and maximize profits is to keep costs at a minimum by adopting the most efficient methods [of production]." Paul A. Samuelson, Economics, at 44 (10th ed. 1976).

Furthermore, vacatur of the Decree does not exempt any party or non-party from its future obligations to refrain from anticompetitive conduct in restraint of trade or monopolistic activity. All pertinent statutes remain in force.

Dart and PMC also contend that termination of the Consent Decree will establish Formica as a dominant and monopolistic force in the plastic laminate industry by virtue of Cyanamid's vertical integration with Formica. MCI joins in this argument.

This Court does not believe that Cyanamid's vertical integration with Formica will diminish competition in the plastic laminate industry. Existing law prevents Formica from reducing the price of its consumer plastic laminate products below the cost of production. There is no basis to believe that Formica enjoys any significant economic advantage from vertical integration so long as the merchant melamine market price remains free from monopolization or price fixing and we believe that the economic self-interest of MCI and Cyanamid will assure this condition, as will the continued foreseeable presence of importer suppliers. Lower consumer prices for plastic laminate products should ensue. The federal antitrust laws are designed to protect competition, not competitors. *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 58 (2d Cir.1979); see also *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358–59 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).

The interests of Dart, PMC and other users similarly situated do not require continuance of the Decree.

We turn now to the contentions of MCI. Implicit in this Court's public interest determination, is the careful consideration of whether termination of the Provision XI captive customer requirement will substantially lessen competition or tend to create a

monopoly. Termination of an antitrust Consent Decree in any industry, which may create a monopoly or lessen competition, does not serve the public interest and will not be sanctioned by this Court.

■ In considering the propriety of a proposed termination, and the public's interest in such action, this Court recognizes that the Department of Justice, as part of the Executive Branch of Government has broad discretion in controlling and determining the public's interest in Government antitrust litigation; a policy interest different from that of this Court. See *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 689, 81 S.Ct. 1309, 1313, 6 L.Ed.2d 604 (1961).

■ Absent abuse of discretion, the Government's conclusion that a decree should be vacated should be given great weight. The Court finds, and there is no credible evidence to the contrary, that the Justice Department has examined carefully the various contentions of these participants concerning termination, and has otherwise fulfilled its own obligation to represent the public's interest in this case. However, this Court does not serve as a rubber stamp for its conclusions.

All we have written above tends to show that the Consent Decree should be terminated; our primary concern is with the effect of the abrupt cessation of purchases by the Formica division from MCI.

At least in the long run, this Court is not persuaded by MCI's argument that termination of Provision XI will strike a death blow to MCI, or re-establish Cyanamid as a monopolist in melamine crystals. Although it will take considerable time and effort, MCI can overcome and replace the loss in sales attributed to the Consent Decree's termination, by actively competing against Cyanamid and the foreign suppliers in the merchant melamine market.[7] Since foreign

---

7. As we noted earlier, text at p. 15, it is foreseeable that Cyanamid's various divisions may continue to purchase melamine crystals from MCI if MCI's prices are competitive. Furthermore, in view of the recurrent spectre of unex-

pected shutdowns due to failure of its own melamine plant, Cyanamid's own economic interest may well be served by making regular contract purchases in reasonable amounts from MCI. Its failure or refusal to do so would

producers presently account for a significant share of the domestic melamine merchant market, their presence prevents Cyanamid or MCI from manipulating the domestic price of melamine, unilaterally or together.

We have noted that melamine production is a capital intensive business. MCI has invested substantial capital in a relatively new plant at Donaldsonville, La. Obviously it cannot recover its capital costs by withdrawing from the melamine market. I conclude that it is very unlikely MCI will cease melamine production as a result of termination of the Consent Decree. MCI now has every incentive to improve the operating efficiency of its melamine plant and of its sales effort, in order to compensate for lost revenues previously received from Cyanamid under the Consent Decree. Furthermore, as observed in relation to Cyanamid's future production and sales to the merchant market, MCI has the economic incentive to continue to produce melamine whenever it can sell the output of its plant at a price in excess of the cost of the marginal unit produced.[8]

While this Court is not persuaded that the termination of Provision XI will cause MCI to go out of business, the Court finds that an abrupt termination thereof will have an adverse impact on MCI of a serious nature.

 It is of course clear that an antitrust consent decree should only endure so long as, and contain only such remedial measures necessary to ensure competition. See *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *United States v. National Lead Co.,* 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947). An antitrust remedy is designed to restore competition not to punish a defendant. *United States v. E.I. du Pont Nemours & Co.,* 366 U.S. 316, 326, 81 S.Ct. 1243, 1250, 6 L.Ed.2d 318 (1945).

 Where, as here, the conditions which the decree was designed to remedy no longer exist, the decree should be terminated, especially where it operates against the competitive designs of antitrust legislation. See *King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31 (2d Cir. 1969); *United States v. Imperial Chemical Industry, Ltd.,* 1957 Trade Cas. ¶ 65,859 at ¶ 74,474 (S.D.N.Y.1957). Accordingly, the Consent Decree should be terminated. Indeed a strong argument can be made that this should have been done long ago.

However, the present nature of the domestic melamine industry mitigates against an abrupt termination of the Consent Decree. Any Consent Decree is born of the Equity powers of this Court. In exercising its powers a Court of Equity must act fairly. A serious question is presented, this Court finding as we do, that the Decree should be terminated, whether relief from Provision XI should not be done on a gradual basis over time, in order to do Equity, and enable MCI to make the production and marketing adjustments necessary to compensate for its sudden loss of Cyanamid's Formica division as a so-called captive customer.

The Consent Decree was intended, *inter alia,* to encourage others to enter the melamine industry. MCI takes the position that

tempt MCI to refuse to respond to emergency demands of Cyanamid except by quoting escalated "spot" prices.

**8.** This economic truth is distorted somewhat in MCI's favor: MCI's parent has a favorable allocation of natural gas, a basic raw material used in MCI's plant, which continues for several years, and might find it better to use this gas than to omit to take it. MCI's present melamine plant is located adjacent to and downstream in the production line from its major source of urea and ammonia, the Triad Urea and Ammonia Plant at Donaldsonville, La. The

Triad plant is jointly owned and operated by Triad Chemicals Corp. and one of MCI's two corporate parents, First Mississippi Corporation. The Donaldsonville production complex includes on-site facilities for rail and vessel transportation of melamine to major domestic and export markets. The design and location of this facility provides ample opportunity and incentive for MCI to improve the efficiency of its production process and marketing techniques, and to make more melamine rather than waste Triad's available constituent products.

it is entitled to special consideration before a Court of Equity because it relied upon the terms of the Consent Decree in entering the industry at a substantial investment of capital. There is substantial authority in the antitrust field to the effect that a decree may only be interpreted to promote competition and does not create vested rights for the benefit of particular competitors. See, *e.g., United States v. Paramount Pictures Inc.,* 333 F.Supp. 1100, 1106 (S.D.N.Y.), aff'd., sub nom. *Syufy Enterprises v. United States,* 404 U.S. 802, 92 S.Ct. 79, 30 L.Ed.2d 37 (1971); *United States v. American Society of Composers, Authors and Publishers,* 341 F.2d 1003 (2d Cir.), *cert. denied sub nom. Metromedia, Inc. v. American Society of Composers, Authors and Publishers,* 382 U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965); *United States v. Loew's Incorporated,* 20 F.R.D. 423 (S.D.N.Y.1957); *United States v. Bendix Home Appliances,* 10 F.R.D. 73 (S.D.N.Y.1949).

Cyanamid argues with some justification that the only provisions in the Consent Decree which worked to the benefit of specific competitors were of fixed duration, and that it did not expect or agree to become "the guarantor of any specific company" or that it would be held to any such obligation 18 years later, when, because of the changes in the industry, and the effect of the Consent Decree, its monopoly power had ended. Cyanamid also argues that "to transform this Government case into a contest between MCI and Cyanamid as to which is most deserving of judicial solicitude is to deprive Cyanamid of rights it bargained for in settling the case." (Memorandum docketed December 21, 1982, p. 16). This argument may overstate the case somewhat, and tends more to show that the provisions of Provision XI may have been improvident when made.[9]

The current economic recession and particularly the difficulties faced by domestic manufacturers of automobiles who are large users of melamine products, affect both MCI and Cyanamid. Products of Cyanamid's Formica division are used to a large extent in the construction industry. Here too, consumption is down due to current economic conditions.

At the time the Consent Decree was framed, other domestic producers were envisioned besides Cyanamid and MCI's predecessor, Fisher Chemical Company, so that true "reliance" in the traditional sense is probably not present here. That is to say, it cannot be shown that MCI's predecessor entered the market with the reasonable expectation of being the sole beneficiary of the captive customer provision in the Decree.

Recognizing the countervailing harm which the phased-out purchasing requirement might impose on Cyanamid, the Court would be willing to undertake so to provide, in order that the sudden disruption of the long standing relationships created by the Decree would not cause undue harm to MCI, its investors and employees. In the present fragile state of our economy, the nation can ill afford any abrupt industrial change which may increase unemployment or cause more manufacturing capacity to become idle. A Court of Equity should not be a party to creating such hardship, particularly where the only issue is whether the Court should act abruptly, or gradually over a sufficient period of time to permit a less painful adjustment.

Cyanamid, once it takes delivery of its remaining 1982 purchase requirements from MCI, will have an inventory position of approximately 20 million pounds of melamine crystal, almost twice its ordinary inventory at this time of year. The cost of carrying this inventory is said to approximate $40,000.00 per month, and the present inventory may be more than sufficient to cover the demands of its Formica division in

---

**9.** This comment is not disrespectful of the memory of our esteemed colleague, predecessor and friend Judge Levet. Like most district judges, then and now, Judge Levet viewed litigation as an adversarial process, favored the settlement of disputes on consent and would have had no qualms about approving a consent decree under the circumstances existing when this decree was presented. When entered, this Decree had the support of the Justice Department and was in accord with the economic and antitrust theories then fashionable.

the entire calendar year 1983, which is expected to be approximately six million pounds of melamine. (Affidavit of Robert P. Kreahling, sworn to Dec. 20, 1982, ¶¶ 10, 20).

This Court, attempting to assist the parties in reaching a compromise, indicated a desire to consider whether in its modification of this Decree MCI could obtain the benefit of a "weaning period" during which Cyanamid's Formica division would gradually phase itself out as a purchaser, and MCI could adjust gradually to fully competitive conditions. Efforts of the parties, at the Court's urging, to reach agreement for a gradual phasing out of Provision XI were unsuccessful.[10]

Absent agreement, this Court had been prepared to impose a period of time for a gradual phasing out of the purchase requirement of Provision XI, and this Court is convinced that a Court of Equity functioning under ideal circumstances should do so.

On reflection, however, there appears to be a fundamental difficulty of impracticality, a prudent consideration of the sort which also regulates a Court of Equity in the exercise of its traditional powers. A Court of Equity will not exercise its equitable powers where it would "require such constant superintendence as to make judicial control a matter of extreme difficulty." *Standard Fashion Co. v. Siegel-Cooper Co.,* 157 N.Y. 60, 66, 51 N.E. 408 (1898); see also, *Beck v. Allison,* 56 N.Y. 366, 370 (1874). Nor will a Court of Equity grant equitable relief where it "appears to be impossible or impracticable." *Doyle v. Allstate Ins. Co.,* 1 N.Y.2d 439, 443, 154 N.Y.S.2d 10, 136 N.E.2d 484 (1956). In this situation, it is the difficulty in rendering judgment, not of enforcing it, that causes the Court to hesitate.

The Court could not simply pick a number between one year and ten years on an arbitrary basis during which to phase out the requirement. A rationale basis would have to be found to determine a reasonable period of time during which MCI could adjust to the sudden withdrawal of its captive customer, the Formica division of Cyanamid, without causing undue hardship in the form of unemployment or waste of assets. In making such a determination, a Court of Equity would also have to consider the equities favoring Cyanamid, which is now possessed of 20 million pounds of MCI melamine, presently and in the foreseeable future unuseable for economic reasons, and being stored at a substantial monthly expense.

Ordinarily it is an article of judicial faith that any disputed matter can be resolved simply by conducting an evidentiary hearing, but this Court perceives no way by which it could determine in this case, after or without an evidentiary hearing, that a precise term of months or years and no longer, would be fair and adequate to allow a gradual phasing in of competition for sales of melamine crystals to the Formica division of American Cyanamid, which never should have been allowed to stop in the first place, and yet not so long and onerous as to burden Cyanamid unfairly.

Solely for reasons of judicial impossibility, and in light of the inability of the parties to agree on a gradual phased in termination, the Court declines to make such a requirement a condition of its granting of the relief requested herein.

The present application is granted to the extent that defendant American Cyanamid Company is hereby released from all executory provisions of the Consent Decree dated August 4, 1964, except those which are merely declaratory of existing law, such release to become effective as of January 1, 1983.

All obligations attaching on or prior to December 31, 1982, including purchases of melamine for the Formica division during that year under Provision XI, shall remain in full force and effect and must be adhered to. This Court reserves jurisdiction over

---

**10.** Pursuant to Rule 408, F.R.Evid., this Court has not considered the respective offers of compromise proposed by the parties.

the parties and subject matter to enforce any provisions of the Decree relative to any period of time prior to January 1, 1983.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to its hearing conducted on October 27, 1982, and all submissions received and docketed since that date.

Settle an order or judgment on five (5) days notice of settlement or waiver of notice. Each party shall bear its own costs.