UNITED STATES of America, Plaintiff,

v.

AMERICAN CYANAMID
COMPANY, Defendant.

No. 60 Civ. 3857–CLB.

United States District Court,
S.D. New York.

Dec. 13, 1984.

Richard Martin and Gregory Hovendon, Dept. of Justice, Antitrust Division, Washington, D.C., for plaintiff.

Kenneth Newman, Donovan, Leisure, Newton & Irvine, New York City, for defendant.

Robert Brookhiser, Washington, D.C., for defendant-intervenor Melamine Chemicals Co., Inc.

## MEMORANDUM DECISION

BRIEANT, District Judge.

By a motion dated October 18, 1984, and heard November 13, 1984 and fully submitted on November 21, 1984, defendant American Cyanamid seeks, for the second time in less than two years, to terminate a Consent Judgment (sometimes hereinafter referred to as the "Decree" or "Consent Decree"), made August 4, 1964, by the late Hon. Richard H. Levet of this Court in the above antitrust action. The United States and intervenor, Melamine Chemicals Co., Inc. ("MCI"), have made submissions in connection with the application. The intervenor opposes the relief requested and also tenders to the Court for resolution issues presented by the unfulfilled 1984 purchase requirements pursuant to the Decree, discussed in greater detail below.

The prior unsuccessful effort of Cyanamid to terminate the Final Consent Judgment in this action, is reported in *United States v. American Cyanamid Co.,* 556 F.Supp. 361 (S.D.N.Y.), *aff'd in part, rev'd in part and remanded,* 719 F.2d 558 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984), and familiarity therewith is assumed. Since the prior attempt, Cyanamid has altered the factual predicate by entering into a contract to divest its Formica Division, discussed below, and now seeks to have the Court consider its request *de novo,* based on the current circumstances. The Government, as it did before, has consented to the relief sought here, providing that the Court adopt certain procedural safeguards to assure that the divesture of the Formica profit center by Cyanamid does take place substantially in compliance with the terms proposed.[1]

Melamine is a fine white crystalline powder which is used in the manufacture of resins, which in turn are used for high pressure laminates, such as "Formica" a well-known trademarked product, manufactured by a division of Cyanamid, as well as artificial chinaware, plastic parts for the automobile industry, and coatings for textile and paper products. In this Court's prior opinion in the last round of the litigation, dated January 10, 1983, and reported

---

1. The Government took the position that "once Cyanamid files an affidavit stating that the divestiture of Formica has in fact been completed in accordance with the terms supplied in these proceedings, the Court should enter an Order terminating the Final Judgment" (Memorandum filed November 9, 1984, p. 2). Essentially, the Government also expresses its own independent conclusion in the same memorandum that "Cyanamid is accurate in representing to the Court that divestiture will transform Formica into 'a fully independent company'." *Id.* p. 4.

at 556 F.Supp. 361, the use of this intermediate plastic product is fully discussed, presented with statistics for industry usage in 1982. These facts found by the Court and essentially not disturbed by the Court of Appeals in its partial reversal and remand, are believed to be sufficiently current at this time and substantially unchanged since 1982.

As this Court observed before, shortly following the entry of the Consent Judgment, there were four domestic producers of melamine, including Cyanamid and Fisher Chemical Co., a predecessor of MCI. Since 1979, there have been only two domestic producers, MCI and Cyanamid. Of the total world production capacity of melamine, as estimated in 1982 by the United States Department of Commerce, only 12% existed in the United States. Melamine is essentially a fungible intermediate chemical. There is no distinctive difference in quality or chemical content according to plant or county of origin. Its production is capital intensive, increased put-through in an operating plant does not increase the fixed costs, and the chemical reaction by which melamine is made proceeds on a continuous flow process, much the same as that of an oil refinery. Urea derived from natural gas is the principal raw material.

It was represented to this Court, without contradiction, that MCI's parent continues to enjoy a favorable, low-cost source of natural gas for its production capacity, while the fix-price contracts of Cyanamid have expired. Because of the nature of the product melamine, it should be expected to sell at a competitive price, having a long term relation to the marginal costs of the least efficient producer.

The complaint in this civil antitrust action was filed October 5, 1960, and alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 7 of the Clayton Act, 15 U.S.C. § 18. The complaint alleged that Cyanamid unlawfully allocated and monopolized the foreign and domestic melamine and melamine-contained markets through its leadership of an international cartel of melamine producers, its

exclusive control and manipulation of melamine technology and the chemical pre-curser product known as "Dicy," then, but no longer, used to produce melamine, and by its acquisition in 1956 of Formica, Inc., the principal domestic user of melamine crystals for the production of high-pressure laminates. As a result of these alleged violations the Government contended in 1960 that the price of melamine and melamine-contained products was unreasonably high, the available supply of melamine unreasonably low, and actual competition in the melamine and melamine-related industries lessened, also that the potential emergence of new competitors in those industries was effectively foreclosed. The litigation was settled by entry of the Consent Judgment, which, of course, did not admit any violation.

Various proceedings during the years in 1969, 1973 and 1974 resulted in modification of the Decree at the request of Cyanamid and with the consent of the Government. In 1975 the Government initiated criminal contempt proceedings against Cyanamid, alleging that Cyanamid in 1972 had wilfully violated the Consent Judgment's maximum melamine production level. This Court, after a trial, found Cyanamid not guilty of criminal contempt. *See United States v. American Cyanamid Co.*, 427 F.Supp. 859 (S.D.N.Y.1977); *see also Stamicarbon N.V. v. American Cyanamid Co.*, 506 F.2d 532 (2d Cir.1974). In 1983, after a hearing, this Court terminated the Decree because of changed circumstances, but that determination was reversed and remanded for further proceedings, as will be described in greater detail below.

The purpose of the Consent Judgment was to dissolve Cyanamid's monopoly of the United States melamine industry and encourage the entrance of new producers into the domestic melamine market. To the extent it is possible to do so, this has already been achieved. MCI has entered the market, and it and Cyanamid are the sole domestic producers.

Following the prior proceedings in this Court in 1983, and following modification thereof by the Court of Appeals, the only surviving provision of significance which is still in effect, and imposes legal burdens on Cyanamid in excess of those already existing under the statutes and case law, is found in provision XI of the Judgment. This provision, by its terms, appears to operate in perpetuity, subject only to defeasance after ten years, upon application to the Court as therein contemplated, and subject also to modification by the Court under its inherent powers as defined by the Court of Appeals in *United States v. American Cyanamid Co.*, 719 F.2d 558 (2d Cir.1984) (hereinafter *"Cyanamid I"*).

The relevant portions of provision XI are quoted in full at page 365 of 556 F.Supp. In essence, they require Cyanamid to purchase annually from other producers of melamine, with the preference to United States producers, an amount of melamine equivalent to the requirements of its Formica Division. Neither this provision nor anything else in the Consent Judgment prevented Cyanamid from manufacturing and selling in a lawful fashion in the merchant market for melamine in its crystal or powdered form. This market consists of Formica's competitors, as well as other users of melamine for other purposes, and they are and have for some time been purchasing directly from either Cyanamid or MCI. Furthermore, Cyanamid uses melamine in its paper surfacecoating and textile treating activities, and for other purposes unrelated to its Formica Division.

The Court of Appeals, in *Cyanamid I* held:

"We therefore reverse the decision of the district court insofar as it holds that 'the conditions which the decree was designed to remedy no longer exist [and] the decree should be terminated,' and we remand for the district court to apply the factors for analyzing the legality of a vertical merger set forth by *Brown Shoe* [370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)], *Fruehauf [Corp. v. FTC*, 603 F.2d 345 (2d Cir.1979)], and other applicable cases, and to make findings of fact as to the current state of the melamine market and the market for products that contain melamine." 719 F.2d at 567.

In so holding, the Court of Appeals concluded that:

"While *Brown Shoe* and its progeny have been the subject of considerable criticism by academicians who believe these cases apply overly harsh standards in assessing the legality of vertical mergers, these cases nonetheless continue to constitute the current state of the law...." [Footnote omitted]; *Id.* at 567.

Following the denial of *certiorari* by the Supreme Court, no proceedings were conducted on remand by Cyanamid. The Court takes this as a concession that while Cyanamid continued to own the Formica Division it would not be able to demonstrate that an analysis of the current facts would show that a vertical merger at this time between itself and Formica would not violate § 7 of the Clayton Act when tested by the obsolete factors enumerated in *Brown Shoe* and *Fruehauf, supra.*

Instead, bearing out this Court's prior findings to that effect, rejected by the Court of Appeals, but held by Professor Yale Brozen, Professor (now Judge) Richard A. Posner, Professor Paul A. Samuelson, Judge Robert Bork and other scholars, to the effect that vertical mergers produce no anti-competitive effects [2], and apparent-

---

**2.** See Professor Brozen's views, quoted at 556 F.Supp. 369, from Yale Brozen, *Concentration Mergers and Public Policy* at 402–03 (1982). Richard A. Posner, *Economic Analysis of Law,* at 3 (2d ed. 1977) ("consistent with the economic concept of man as a 'rational maximizer of his self-interest' an individual will alter the operation of his business in response to economic changes in his surroundings to do so." Paul A. Samuelson, *Economics,* at 44 (10 ed. 1976) ("the

method [or raw material] that is the cheapest at any one time because of both physical efficiency and cost efficiency, will displace a more costly method [or raw material]. The only way for producers to meet price competition and maximize profits is to keep costs at a minimum by adopting the most efficient methods"). P. Areeda and D. Turner, *Antitrust Law,* ¶¶ 1000–109 (1980); Robert Bork, *The Antitrust Paradox,* 225–45 (1978).

ly having despaired of convincing the Court of Appeals or the Supreme Court that this particular Emperor (vertical integration as an anti-competitive effect) has no clothes, Cyanamid concluded, with the aid of an investment banking house, to sell its Formica profit center to a management group as part of a leveraged buyout.

On October 12, 1984 Cyanamid made a public statement, printed in the Wall Street Journal, which advised in relevant part as follows:

> "American Cyanamid Co. said it signed a definitive agreement to sell most of its Formica plastic laminate business for about $200 million in a leveraged buyout.
>
> The Formica business will be bought by a new company formed by some Formica managers and Shearson Lehman/American Express Inc. About 10% of the purchase price will be paid in preferred stock of the new company, and the rest will be paid in cash.

> \* \* \* \* \* \*

> The part of the Formica business being sold is expected to have 1984 sales of $275 million to $280 million, a Cyanamid spokesman said. The sale will include all of Formica's operations in the U.S. and abroad except Formica's troubled Latin American business. Last year, sales of Formica products in Latin American [sic] dropped 40%, offsetting a resurgence of Formica business in the U.S. The Cyanamid spokesman said the Latin American sales haven't changed much since then. In a leveraged buyout, a company is taken private in a transaction that is largely financed by borrowing. Ultimately, the debt is paid with funds generated by the target company.

> The planned purchase is subject to the buyers obtaining financing.

> \* \* \* \* \* \*

> Last May, Cyanamid said it had hired an investment banker to find a buyer for most of the Formica business because of its cyclical nature tied to the building industry.

> The Cyanamid spokesman said the sale is expected to be completed before year-end. If so, the sale is likely to produce a 'nominal gain' in Cyanamid's fourth-quarter earnings, he said."

The stock market, which is never wrong, reacted to this good news by pricing the common stock of Cyanamid up $1.875 over the price of the prior day, apparently confirming the conclusion of management that vertical integration adds little to corporate efficiency or profitability.

■ It is insufficient for purposes of this proceeding simply to inform the Court that there has been an agreement to effect a divestiture. The Court must ascertain whether the divestiture is real or merely formal, and whether, following divestiture, the company achieving the leveraged buyout of the Formica assets of Cyanamid ("New Formica") will in fact be a free-standing, independent, economic enterprise, willing and able to purchase its melamine from the most advantageous source at the most competitive price and conditions of sale.

The divestiture agreement, together with exhibits annexed thereto, has been submitted to the Court for perusal as confidential material pursuant to a protective order, and has also been made available to counsel for the intervenor and the Government. There is no need for this Court to recite the details of the agreement, nor will the public interest be served by disclosure of confidential information. Under the agreement, Wayne Group, Inc. agrees to acquire by merger with its subsidiary, WGI Acquisition Corp., all of the capital stock of Formica Corporation presently owned by Cyanamid. Immediately thereafter WGI Acquisition Corp. will merge with Formica Corporation and carry on the Formica business previously conducted by Cyanamid, everywhere, except in Latin America. The Latin American aspect of Cyanamid's efforts have been less than successful and profitable, and so minimal as not to occupy the attention of the Court.

Under the agreement, Cyanamid shall receive $175,100,000 in cash, and preferred

stock of New Formica having a stated value of $20,000,000. The common stock of the new entity will be shared as to ownership by five current members of the Formica management group, who will own one-third thereof and manage the new enterprise, and Shearson Lehman/American Express, Inc., which will provide the venture capital and own the remaining two-thirds.[3]

The preferred stock issue by its relatively standard terms raises an immediate red flag. However, as promised in the course of the hearing, Cyanamid, by written instrument dated November 16, 1984, has agreed with New Formica that notwithstanding provisions which grant the preferred shareholders the right to elect one director of New Formica, whenever six consecutive dividend payments are in arrears, "upon termination of the Melamine Consent Decree and for so long as we or any person, firm or corporation, controlling, controlled by or under common control with us are the record or beneficial owners of the cumulative preferred stock, or any portion thereof, we hereby irrevocably waive our right to elect a director as aforesaid."

■ Upon assurance that no such voting power may ever arise in favor of Cyanamid, this Court finds and concludes that the ownership of the preferred stock issue is a sufficiently attenuated relationship with New Formica, so that it is unlikely to distort any management decisions on the part of New Formica, particularly the decisions as to how or where it purchases melamine. The existence of the preferred stock will not require that the consent judgment remain in effect.

Apart from the preferred stock, Cyanamid will have no future financial stake in Formica and no role in its management. Specifically, it receives no security interest in any of Formica's assets, and has no right to reassume control over Formica in the future.

**3.** The cash financing necessary, $175.1 Million Dollars, will come from sources independent of Cyanamid. Each party has separate outside

■ The Court concludes that the net effect of the agreement is such that it represents a complete divestiture, with the same force and effect as if divestiture had been required by the Court in 1956 or thereafter, or even now, as an alternative to the execution or continuation of the Consent Judgment. There is absolutely no evidence that the arrangements between Cyanamid and New Formica are anything but what they appear to be, a typical leveraged buyout, whereby management of a division or profit center takes over its operations in behalf of an independent company owned by themselves and the investment bankers. Ample opportunity has been granted to the parties to develop evidence to the contrary, and none is forthcoming.

The Court finds and concludes that defendant has proved that from and after the effective date of the divestiture, it will be out of the Formica business, except in Central and South America.

Since this Court finds that the divestiture of the Formica business of Cyanamid will be complete upon the closing presently scheduled for December 31, 1984 with Wayne Group, there is now no purpose in engaging in the detailed analysis required by the Court of Appeals in *Cyanamid I.* Divestiture is a substitute for all such analysis. Divestiture of Formica was the greatest possible relief which the Government could have obtained in this lawsuit at any time during its lengthy history. Having voluntarily undertaken to divest itself of the Formica business and having destroyed the presumed anticompetitive vertical merger which supposedly foreclosed the competitors of Cyanamid from a segment of the market otherwise open to them, *i.e.,* the sale of melamine to the Formica business, creating thereby a "clog on competition" (quoted from *Brown Shoe,* 370 U.S. at 324, 82 S.Ct. at 1523), Cyanamid now demonstrates that as of such divestiture the Consent Judgment serves no purpose. Cyanamid is correct in contending that,

counsel in connection with the divestiture, and separate investment bankers.

even without regard to divestiture, the continued effect of the Judgment has long been "unjustified, anticompetitive and unfair" (Affidavit of Frank V. AtLee, docketed August 18, 1984). The Government, since 1982 has taken the position that the provisions of the Decree affecting MCI have become "anticompetitive under contemporary market conditions." (Government Memorandum filed November 9, 1984, p. 11, fn. 15).

There is no necessity, nor is it appropriate, to defer action until divestiture by Cyanamid of its Formica business is complete. Implicit, although not expressed in the agreement with New Formica, is the concept that as a practical matter the divestiture and sale will not close unless the Consent Judgment is terminated. The only reference thereto in the agreement is as follows:

"9. INDEMNIFICATION AND APPORTIONMENT OF OBLIGATIONS.

9.1 *Cyanamid Indemnity.* Cyanamid shall indemnify and hold harmless [New Formica] from and against any and all loss, liability, cost and expense (including any tax payable by reason of the receipt of indemnification payments) arising out of:

* * * * * *

(c) Any liability or obligation with respect to the purchase of melamine which may be imposed upon [New Formica] under the Melamine Consent Decree, filed in the U.S. District Court for the Southern District of New York on July 1, 1964 in *U.S. v. American Cyanamid Company.*"

The practical significance of this clause is lost on the Court; the preference for domestic melamine found in the Judgment might conceivably lead to some loss, also it might be expensive to persuade the Court that a particular price quote is "oppressively high." (See subparagraph (C) of Provision XI quoted at 556 F.Supp. 365). Other than that, this provision seems to be so much useless boilerplate.

The truth of the matter is that the agreement which Wayne Group, Inc. has with

Cyanamid, like most similar leveraged buyout transactions, is probably not subject to specific performance, and if it were, the agreement of the non-party lender to provide the necessary funds likewise is probably not amenable to such specific enforcement. No reasonably prudent investor would knowingly acquire a manufacturing business which must buy its raw material from one source when its competitors need not, and where the price is fixed by the supplier only subject to obtaining judicial relief if it is found to be "oppressively high," whatever that means. Faced with such an eventuality, there will be no closing because common sense dictates that the lender, and probably also the buyer, will just walk away.

Accordingly, it is appropriate that the issue be resolved in advance of the closing date in the agreement, now set for December 31, 1984. Conditioned on entry of a detailed order which will require that the divestiture be completed substantially in accordance with the agreement submitted to the Court, the Consent Judgment shall be vacated as of such completion.

*Melamine Purchases*

As of August 4, 1984 all provisions of the Consent Judgment, other than those which this Court has already found obsolete and as to which no issue has ever been raised, expired, except for the purchase requirement. Divestiture frees MCI and all others to sell melamine to New Formica, so that no foreclosure of market is now possible.

It will be recalled that pursuant to terms of the Consent Judgment discussed fully in *Cyanamid I,* a provision, on its face perpetual, requires Cyanamid to purchase *annually* from other producers of melamine, with the preference to United States producers, an amount of melamine equivalent to the requirements of the Formica Division. In our prior termination of this Consent Judgment, which was reversed, this Court recognized that intervenor MCI is now, in practice, the only other producer of melamine in the United States, and now the sole beneficiary of this requirement. The

Court found, assuming termination of the Decree, which this Court then thought appropriate, that:

"[T]he present nature of the domestic melamine industry mitigates against an abrupt termination of the Consent Decree. .... A serious question is presented ... whether relief from provision XI should not be done on a gradual basis over time in order to do Equity and enable MCI to make the production and marketing adjustments necessary to compensate for its sudden loss of Cyanamid's Formica Division as a so-called 'captive customer'." (556 F.Supp. at 371).

This Court concluded, in the last round of this litigation, that there was a fundamental difficulty of impracticality, a prudent consideration of the sort which also regulates a court of equity in the exercise of its judicial powers, and that for reasons therein stated, the Court could find no valid basis to determine the appropriate length of a period of termination.

The Court of Appeals in *Cyanamid I* rejected this conclusion. It held that if the district court on remand should

"continue to believe that a phase-out would be appropriate, the court should exercise its equitable power to determine an appropriate duration for such a phase-out.... Difficulty in rendering judgment may only rarely be sufficient reason for a court of equity to refuse to exercise its equitable powers, and there is not a sufficient reason upon the facts of this case to justify a refusal herein. Indeed, ... abrupt termination of Part XI without a phase-out is in itself an exercise of equitable power." (719 F.2d at 567).

We now consider what should be done with respect to Part XI, based on current facts.

To begin with, this Court agrees with the position of Cyanamid that "no proper purpose can be served by retaining the Pur-chase Requirement subsequent to the divestiture of Formica, since that divestiture frees MCI completely to sell melamine to Formica and no "foreclosure [of the market] is any longer possible." (Brief of Cyanamid, docketed October 18, 1984, p. 5).

The equities have changed further since it is undisputed that Cyanamid no longer enjoys a favorable long term natural gas purchase contracts from which it was manufacturing melamine, while MCI continues to enjoy such an advantage.

In light of the complete divestiture, and because MCI has had notice at least since October of the intention by Cyanamid to divest itself of its Formica Division, the Court sees no purpose in imposing any greater or more gradual phase-out. The situation is materially altered from that presented in *Cyanamid I;* after *Cyanamid I*, Cyanamid remained in the laminate business. After divestiture, there is no longer any vertical combination and therefore no "foreclosure" of the market, and MCI will be at least on equal terms with Cyanamid in providing melamine to New Formica. Indeed, this Court believes that MCI will be in a better position than Cyanamid or anyone else because of its continuing favorable natural gas supply contracts.[4]

The Consent Judgment, neither by its terms, nor as administered by the parties had fixed the date as of which purchase orders had to be issued for annual requirements. It merely required Cyanamid to buy an amount equal to the annual needs of its Formica Division by giving a purchase order at some time during or immediately after the close of the year in which the requirements applied. There was no requirement that the melamine so purchased actually be used to make laminates; it could be and was commingled with Cyanamid's own product and used for whatever defendant wanted. It is uncontradicted that as of September 1, 1984 Cyanamid's

---

**4.** Since 1982 the Government has taken a position that a phase-out period for the purchase requirement is "not warranted or appropriate."

(Government Memorandum filed November 9, 1984 at p. 11, fn. 15).

inventory was more than twice the normal inventory, and that monthly carrying charges for this inventory were approximately $67,000.

Beginning in mid-1982, when Cyanamid initiated the first round of this litigation to terminate the Consent Judgment, it purchased no melamine from MCI or any outside source, until the end of the year, when it placed an order with MCI for an amount equal to the balance of 1982 melamine requirements for the Formica Division. Due to the size of that order, production and delivery did not take place, apparently by mutual agreement, until some time later in 1983. In 1983 while *Cyanamid I* was pending appeal or awaiting action on a petition for *certiorari*, Cyanamid purchased no melamine from MCI. In 1984 it purchased and took delivery of the 1983 purchase obligations. This had an adverse effect on MCI, causing it to reduce its capacity and shut its plant down for longer than normal periods in 1983, and also to lose the use of funds which would have been received had the sales been made in 1983. However, it is apparently not disputed that Cyanamid was within its rights under the literal provisions of the Consent Judgment to withhold issuing a purchase order for the balance of its 1983 requirements until 1984.

In April 1984, according to the undisputed affidavit of Scotty B. Patrick, Vice President and General Manager of MCI, Cyanamid declined to make a commitment for 1984 purchases, or to schedule the issuance of purchase orders. However, at no time until about October, 1984, did Cyanamid advise that it would not purchase its 1984 requirements under the Decree. On October 12, 1984 Cyanamid told MCI formally, what was already a matter of public knowledge, that it had agreed to sell its Formica Division and planned to seek relief from the Court. Cyanamid then declined to purchase any melamine from MCI for 1984.

 It would seem relatively obvious that the Consent Judgment, which partakes of contractual elements, should not be vacated retrospectively. The Government takes the position that the Consent Judgment, by its terms, obligates Cyanamid to purchase a *pro rata* share of melamine from outside domestic sources (MCI), for the Formica operations for the period of time during any calendar year that the Judgment has been in effect, and this Court agrees. It is the law of the case, pursuant to *Cyanamid I*, that the Consent Judgment *cannot* be vacated until the criteria set forth by the Court of Appeals in *Cyanamid I* have been satisfied. Since they apparently cannot be satisfied without divestiture, Cyanamid has opted for divestiture.[5] Only effective on divestiture will Cyanamid's obligations cease.

This Court concludes that as a condition of the relief requested herein, and indeed, in all events, Cyanamid and/or New Formica must issue a purchase order to MCI immediately prior to the divestiture for an amount of melamine equal to the amount of melamine used by the Formica Division of Cyanamid during the calendar year 1984 in production of its laminates, and also for that amount of melamine, if any, used by the Formica Division of Cyanamid during any part of 1985 prior to actual closing and performance of the divestiture agreement. If the purchase order is issued by New Formica, Cyanamid must guaranty payment therefor. The delivery schedule for the purchase of the 1984 requirements shall provide for dates acceptable to both parties, provided that all melamine required to be purchased thereunder shall be taken prior to July 31, 1985, unless MCI shall consent to a later date.

 The mechanics of divestiture may not be permitted to frustrate MCI expectations that it will continue to benefit from the Judgment with respect to all of the

---

**5.** We do not suggest that this is the sole motive for selling the Formica Division; there are obviously economic benefits flowing from the divestiture apart from the elimination of the purchase obligations of the Judgment. Whatever the Judgment provides, it does not require Cyanamid to remain in the laminate business forever; probably any such provision would be unconstitutional, if not void for vagueness or impossibility.

requirements of Cyanamid for melamine used by the Formica Division through the date of closing of the divestiture agreement. Accordingly, the opening inventory of melamine of New Formica and the amount, if any, ordered by but not delivered to New Formica from MCI at closing may not exceed the amount of melamine which Cyanamid was required by the Judgment to purchase from outside sources since January 1, 1982 through the day of divestiture, less the amount of melamine actually used by Cyanamid since January 1, 1982 through the date of divestiture, in the manufacture of laminates by its Formica Division. Essentially, the Court observes that equity deems done that which should have been done, and either New Formica or Cyanamid should perform the Judgment fully through the date of its termination. New Formica's inventory of melamine owned or on order should not exceed the amount of melamine inventory which it would have possessed, if, since 1982, all of the division purchases had been made from non-Cyanamid sources and all such purchases had been used in or held for the manufacture of laminates. Following divestiture Cyanamid may not sell any melamine to New Formica from its inventory which existed on the day of divestiture, at less than cost, applying FIFO principles of accounting and lot identification. If the computation necessary to achieve this result, presents practical difficulty, counsel for the parties may take the matter up with the Court on the settlement of the order terminating the Consent Judgment.

We note in closing that the national economy is not served by MCI actually making a large quantity of useless melamine, which Cyanamid or New Formica will have to purchase, inventory and carry at great expense until it can be used, simply to satisfy a Consent Judgment.[6] Nothing prevents the parties from negotiating a release of the unperformed purchase obligation, whereby MCI would receive its lost profits in lieu thereof. The Court, however, is not in a position to compel such rational conduct, unless the parties wish to do so.

The foregoing constitutes the findings of fact and conclusions of law of this Court after a hearing.

Submit a final order on five (5) days notice of settlement or waiver of notice, which will dispose of the issues presently tendered to the Court consistently with these findings and conclusions.

---

6. Cyanamid's hardship is largely self-created since it was foreseeable that the Court of Appeals might reverse in *Cyanamid I*, as it did, and that *certiorari* might be denied by the Supreme Court, as it was.