UNITED STATES of America,
Plaintiff-Appellee,

v.

AMERICAN CYANAMID CO., Defendant-Appellee and Cross-Appellant,

Melamine Chemicals, Inc.,
Intervenor-Appellant-Cross-Appellee.

Nos. 1237, 1455, Dockets 83–6041, 83–6053.

United States Court of Appeals,
Second Circuit.

Argued May 12, 1983.

Decided Oct. 5, 1983.

Certiorari Denied March 19, 1984.
See 104 S.Ct. 1596.

Ray S. Bolze, Washington, D.C. (Robert J. Brookhiser, Jr., Jean M. Allison, Howrey & Simon, Washington, D.C., James K. Leader, Holly S. Stein, Townley & Updike, New York City, John C. Biehl, Ashland Oil, Inc., Ashland, Ky., Alfred L. Price, First Mississippi Corp., Jackson, Miss., on the brief), for intervenor-appellant-cross-appellee.

Edward T. Hand, Washington, D.C. (William F. Baxter, Asst. Atty. Gen., Abbott B. Lipsky, Jr., Barry Grossman, Gregory B. Hovendon, Joan S. Huggler, Dept. of Justice, Washington, D.C., on the brief), for plaintiff-appellee.

Kenneth E. Newman, New York City (Peter R. Chaffetz, James L. Stengel, Donovan, Leisure, Newton & Irvine, New York City, on the brief), for defendant-appellee-cross-appellant.

Before OAKES, CARDAMONE and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Melamine Chemicals, Inc. (MCI) appeals from an order of the United States District Court for the Southern District of New York, Charles L. Brieant, *Judge,* 556 F.Supp. 361, entered on January 25, 1983, granting the motion of the American Cyanamid Co. (Cyanamid), made with the consent of the government, to terminate all provisions of a Consent Decree entered against Cyanamid by Judge Levet on August 4, 1964, and resulting from a civil antitrust action brought by the government against Cyanamid.[1] Cyanamid cross-appeals from an order entered November 11, 1982, granting MCI and Dart Chemicals, Inc. leave to intervene permissively, 556 F.Supp. 357. At issue herein is the termination of Part XI of the decree, which compelled Cyanamid to purchase a portion of its requirements for melamine from other producers of melamine. In particular, the issues to be addressed are: (1) whether the district court erred in permitting MCI and Dart Chemicals, Inc. to intervene; (2) whether the district court erred in applying a "public interest" standard to decide whether to terminate Part XI of the decree which provided its own higher standard, simply because the government consented to the termination; and (3) having found that a phase-out for Part XI would be desirable, whether the district court erred in declining to order such a phase-out "solely for reasons of judicial impossibility." For the reasons set forth below, we hold that MCI was properly allowed to intervene, but that the district court erred in applying the "public interest" standard and in failing to devise a reasonable phase-out period.

## I. FACTS

Melamine is a white, crystalline powder used in the manufacture of resins which, in turn, are used in the manufacture of high-pressure laminates such as "Formica," laminate resins, adhesives, artificial china, plastic parts for the auto industry, molding

---

1. The subject district court decision is reported at 1982–83 Trade Cas. (CCH) ¶ 65,152 (S.D.N.Y.1983).

compounds, and coatings for textile and paper products. Melamine is a fungible material, with no significant difference in quality or chemical content according to plant or country of origin. MCI and Cyanamid are currently the only domestic United States producers of melamine.

Defendant-appellee-cross-appellant Cyanamid produces a wide variety of chemicals and chemical-based products, including all of the products made from melamine listed above. A portion of the melamine which it produces is used internally in the manufacture of these products, and the rest is sold by Cyanamid in the "merchant market"— i.e., to domestic producers of products containing melamine.

Intervenor-appellant-cross-appellee MCI is a melamine producer which is a joint venture between Ashland Oil, Inc.[2] and First Mississippi Corp. MCI supplies melamine to the "merchant market." MCI is not vertically integrated and therefore does not use internally any of the melamine which it produces.

Prior to 1964, dicyandiamide (Dicy) was the primary raw material from which melamine was made. Cyanamid was able to control domestic supply and price of melamine through ownership and operation of the only Dicy production plant in North America. Through its control of the United States Dicy industry, Cyanamid allegedly had become an influential member of an international cartel of melamine producers. This cartel allegedly controlled the worldwide price and supply of melamine and allocated markets, including restricting the importation of foreign melamine into the United States. Cyanamid also controlled the use of melamine technology through its Dicy and melamine-related patents.

## A. The Consent Decree

The government filed a complaint against Cyanamid on October 5, 1960, alleging that Cyanamid had violated Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2 (1976) and Section 7 of the Clayton Act, 15 U.S.C. § 18 (1976). In particular, the factual allegations in the complaint were that Cyanamid was, within the period covered by the complaint, the sole producer of melamine for sale in the merchant market in the United States; that Cyanamid had conspired with six foreign and domestic companies, enabling it to exploit the advantage it derived from its exclusive control in the United States of Dicy; that it had manipulated the availability and prices of Dicy, thereby discouraging domestic melamine manufacture by others; that it had caused foreign producers to refuse to sell melamine to anyone in the United States without Cyanamid's approval; and that, in 1956, it had acquired Formica Co., a leading consumer of melamine resins, for the purpose of foreclosing others from selling melamine to Formica Co. and eliminating a substantial independent competitive factor in the manufacture of laminating resins and laminates. As a result, the complaint alleged *inter alia* that the prices of melamine and melamine-containing products were maintained at unreasonably high levels; that competition in the manufacture of melamine and products containing melamine was lessened; that actual and potential competition in melamine was foreclosed; and that the public was deprived of an adequate supply of melamine and products containing melamine.

A settlement agreement was entered by the parties without trial or adjudication of any issue, and a final judgment was entered on August 4, 1964.[3] The final judgment, *inter alia,* required Cyanamid to divest itself within two years of one of its two melamine producing plants; to share its technology in melamine-related fields for up to ten years; to forego acquisitions in melamine-related fields for ten years and obtain government or court approval for

---

**2.** Ashland entered the melamine market in 1966 when it acquired Fisher Chemical Co. Fisher had previously purchased Cyanamid's Willow Island melamine plant under Part IV of the consent decree here at issue.

**3.** The settlement is reported at 1964 Trade Cas. (CCH) ¶ 71,166 (S.D.N.Y.1964).

any such acquisition in the following ten years; to limit for ten years the amount of melamine that Cyanamid could produce; and not to engage in certain acts including entering into or maintaining agency relationships with the co-conspirator companies named in the decree. At issue in this case is Part XI of the decree, which states in part:

> Cyanamid is ordered and directed to purchase annually from other producers of melamine (with the preference to United States producers) an amount of melamine equivalent to the requirements of Cyanamid for melamine for use by Cyanamid in the production of laminates in the United States provided that at any time after ten (10) years from such date, Cyanamid may petition to this Court to be relieved from this provision, such relief to be granted upon a showing by Cyanamid to the satisfaction of this Court that the effect of such relief will not be substantially to lessen competition or tend to create a monopoly in any line of commerce in any section of the country.

Under this provision, Cyanamid was to purchase the melamine requirements for its recently acquired Formica subdivision from the merchant market. As noted by the government, the provision was designed to "deny to Formica the benefits which might accrue from vertical integration with Cyanamid and to require Formica to compete worldwide for melamine with other producers of laminates."[4] Although Cyanamid was not ordered to divest itself of Formica Co., the purchase requirement obviously was intended to prevent Cyanamid from foreclosing other suppliers from selling melamine to Formica Co.

Many provisions of the consent decree have expired or been fully satisfied since the final judgment was entered. In particular, Cyanamid divested itself of one of its melamine plants in 1964 and additionally the following provisions have expired: the ban on acquisitions, the melamine produc-tion limitations, and many of the patents subject to technology-sharing requirements. Moreover, Cyanamid and the government argue that many significant changes in the industry have occurred during the intervening years. One such change was the replacement of the Dicy-based melamine manufacturing process with a urea-based process owned and licensed by Samicarbon N.V. of the Netherlands. A second change is that Cyanamid is no longer the sole source of melamine, as MCI presently also produces melamine. Other changes in the market are discussed *infra*.

**B.** *Consent Decree Termination Proceedings*

In May, 1981, Cyanamid sought the government's consent to terminate the remaining provisions of the final judgment. Cyanamid argued that the melamine purchase provision had become an anticompetitive subsidy to MCI. The government undertook a fifteen-month investigation of the alleged changes, during which comments from interested parties were sought, and concluded that the decree itself had indeed become anticompetitive. The government proposed to give its consent if Cyanamid would dedicate certain patents to the public, and Cyanamid agreed.

On August 9, 1982, Cyanamid moved in the district court to terminate the consent decree, and on the same day the government filed a memorandum in support of Cyanamid's motion. MCI and Dart Industries, a plastic laminates producer, moved to intervene. MCI claimed that it had entered the melamine business in reliance on Part XI of the decree; since MCI's entry into the market, Cyanamid has been one of MCI's largest customers; and Cyanamid had informed MCI that if the decree were terminated, Cyanamid would no longer purchase melamine from MCI. This, MCI claimed, would have a direct and substantial adverse impact upon MCI and upon MCI's customers, which compete with Cyanamid in the manufacture of melamine resins and mela-

---

**4.** Memorandum of the United States in Opposition to the Application by American Cyanamid Company for a Protective Order to Section XI(c) of the Final Judgment, at 3 (November 14, 1974).

mine-containing products.[5] The district court held that intervention of right was inappropriate, but granted MCI's motion for permissive intervention in an order entered on November 10, 1982.

On October 27, 1982, the district court held a hearing on Cyanamid's motion to terminate the decree. In an opinion dated January 10, 1983, the court found that "profound and complex changes have taken place in the melamine production industry." 1982–83 Trade Cas. (CCH) ¶ 65,152, at 71,536. The example of such "changes" cited by the district court was that the urea process for producing melamine is now used by "virtually all" melamine producers worldwide, thus dissipating Cyanamid's control over the basic raw material for producing melamine. The court noted that currently MCI is the only producer of melamine in the United States other than Cyanamid, and thus the sole beneficiary of the purchase provision of the decree. The court then held that Cyanamid was not compelled to comply with the higher standard of proof contained in Part XI, i.e., that termination "will not . . . substantially . . . lessen competition or tend to create a monopoly in any line of commerce in any section of the country." This standard was found to apply only if Cyanamid sought termination without the government's consent. Instead, the court held that when the government does consent, the proponent of termination need only show that termination is " 'in the public interest,' " *id.* at 71,538, *quoting United States v. Swift & Co.,* 1975–1 Trade Cas. (CCH) ¶ 60,201, at 65,702 (N.D.Ill.1975).

Turning to the contentions of the laminate manufacturers (Dart Industries, Inc. and *amicus* Plastics Manufacturing Co. (PMC)) the court found that termination of the decree would not enable MCI to acquire a monopoly position in the merchant market, as Dart and PMC had contended, stating that "[i]f sound economic considerations should prompt Cyanamid to withdraw from the merchant melamine market, foreign producers should be expected to compete with MCI for the merchant melamine market demand previously satisfied by Cyanamid." 1982–83 Trade Cas. (CCH) ¶ 65,152, at 71,538–39 (footnote omitted). Moreover, the court noted that vertical integration is not, in and of itself, anticompetitive and may promote efficiency and enhance competition. Vertical integration with Formica Co. was found unlikely to cause diminished competition in the plastic laminates market, since "[e]xisting law prevents Formica from reducing the price of its consumer plastic laminate products below the cost of production." *Id.* at 71,540. Thus, the court concluded that the interests of Dart and PMC do not require continuation of the decree.

Apropos the interests of MCI, the court found that termination of Part XI would not be likely to "strike a death blow to MCI, or re-establish Cyanamid as a monopolist in melamine crystals." *Id.* Rather, it was found that MCI could "overcome and replace the loss in sales attributed to the Consent Decree's termination, by actively competing against Cyanamid and the foreign suppliers in the merchant melamine market." *Id.* (footnote omitted). The court concluded that the decree should be terminated, but found that "an abrupt termination [of Part XI] will have an adverse impact on MCI of a serious nature," *id.* at 71,541, and that a phase-out would be preferable. However, the court felt that it was unable to determine the appropriate duration of a phase-out period and ordered an abrupt termination notwithstanding its conclusion that a phase-out was preferable. *Id.* at 71,542–43.

## II. DISCUSSION

### A. *Intervention*

We first address Cyanamid's contention on the cross-appeal that the district court

---

5. Dart Industries, Inc. contended that termination of the decree would have an anticompetitive effect on the plastic laminates industry because it would enable Cyanamid to withdraw completely from the merchant melamine crystal market to meet its internal demands. This would allegedly allow MCI to attain a monopoly position in the merchant market, resulting in higher prices for melamine, which in turn would allow Cyanamid to "price squeeze" Dart out of the market. The district court granted Dart's motion to intervene permissively, but Dart apparently chose not to take part in this appeal.

erred in granting MCI's motion to intervene permissively pursuant to Fed.R.Civ.P. 24(b).

■ Under Rule 24(b), a district court may grant leave to intervene permissively if it determines that a United States statute creates a conditional right for the applicant to intervene and the condition is satisfied or if the applicant's claim or defense and the main action have common questions of law or fact. A district court's decision on whether leave to intervene permissively should be granted can only be overturned if it constitutes an abuse of discretion. *United States Postal Service v. Brennan,* 579 F.2d 188, 191–92 (2d Cir.1978).

■ Here, after deciding that MCI could not intervene of right, the district court addressed whether permissive intervention should be allowed. Since no federal statute granting a conditional right to intervene was present, the court analyzed whether a common question of law or fact existed and whether undue delay would result. The court concluded that the applicants' claims that termination would have an anticompetitive effect on the laminates market are directly related to the ultimate questions herein, and that no undue delay would result from granting leave to intervene. Thus, permissive intervention was granted. We agree with this reasoning and do not believe that it amounted to an abuse of discretion. Thus, we affirm the district court's decision to grant MCI's petition for leave to intervene permissively.

## B. *Standard for Termination of Part XI*

Appellant MCI contends that the district court applied an incorrect standard for terminating Part XI of the consent decree. In particular, appellant argues that the "public interest" standard, which the district court used, was inapplicable here because Part XI expressly stated its own standard for termination, which was that Cyanamid must demonstrate that the effect of the termination "will not be substantially to lessen competition or tend to create a monopoly." This language is nearly identical to that used in Section 7 of the Clayton Act, 15 U.S.C. § 18 (1976 & Supp. V 1981).

Consent decrees have been recognized as having attributes of both contracts and judicial acts. In *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975), the Court stated:

> While [consent decrees] are arrived at by negotiation between the parties and often admit no violation of law, they are motivated by threatened or pending litigation and must be approved by the court.... Because of this dual character, consent decrees are treated as contracts for some purposes but not for others.

*See United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

For purposes of interpreting the meaning of a consent decree, the Supreme Court has tended to apply principles of contract law. One such principle is to treat the decree as an embodiment of the intent of the parties. This view is reasonable, since such decrees are often entered without proof of any violations and "cannot be said to have a purpose" in and of themselves; rather, "the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *Id.* (footnote omitted). Thus, the Court has observed that "the scope of a consent decree must be discerned within its four corners" and "the instrument must be construed as it is written," *id.* at 682, 91 S.Ct. at 1757, and "without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation," *ITT Continental Baking Co.,* 420 U.S. at 237, 95 S.Ct. at 935. It should be noted, however, that this doctrine was developed in cases in which the question for decision was whether the existing consent decree had been violated and the government was urging a construction of the subject consent decree which the Court held was not supported by the language of the decree. *E.g., United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *United States v. Atlantic Refining Co.,* 360 U.S. 19,

79 S.Ct. 944, 3 L.Ed.2d 1054 (1959); *Hughes v. United States,* 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952). In each of those cases, a danger existed that the defendant might be penalized for conduct not prohibited by the decree. *See ITT Continental Baking Co.,* 420 U.S. at 237, 95 S.Ct. at 935. Here, that danger is not present since the government is not claiming that Cyanamid is engaging in conduct in violation of the decree. Rather, the government and Cyanamid are in agreement as to the termination of the decree.

When the facts of a given case do not lend themselves to easy resolution by viewing the decree as akin to a contract, courts have turned to the quasi-judicial nature of consent decrees and have resorted to equitable considerations. For instance, in *Chrysler Corp. v. United States,* 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942), the Court was confronted with petitions to extend the duration of a provision in an existing decree. The provision did not expressly address the issue of extension. The Court noted that the proper test in those circumstances was whether "the [proposed extension] served to effectuate or to thwart the basic purpose of the original consent decree." *Id.* at 562, 62 S.Ct. at 1150.

■ *Chrysler* may be read consistently with *Armour,* despite the reference by the former to "the basic purpose of the consent decree" and the admonition by the latter that consent decrees do not, in and of themselves, have a purpose. As noted by the Ninth Circuit in *United States v. Motor Vehicle Manufacturers Association of the United States, Inc.,* 643 F.2d 644, 650 (9th Cir.1981) (citation omitted):

The authority of a federal district court to adopt a consent decree comes only from the statute which the decree is intended to enforce. If there is a "purpose" to be effectuated, it is the purpose of the statute pursuant to which the government seeks relief. Within that framework, the parties strike their bargain.

Thus, when the language of a consent decree provision is not clear on its face, a court of equity may, in construing the provision, consider the purpose of the provision in the overall context of the judgment at the time the judgment was entered. Using its equitable powers, a court may modify a decree in response to changed conditions. *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

Here, the language of the decree is quite clear. Part XI unambiguously states that "at any time after ten (10) years from [the date Cyanamid sells one of its melamine production plants] Cyanamid may petition to this Court to be relieved from this provision, such relief to be granted upon a showing by Cyanamid to the satisfaction of this Court that the effect of such relief will not be substantially to lessen competition or tend to create a monopoly in any line of commerce in any section of the country." No provision has been made to apply a different standard where the government joins with Cyanamid in a petition to terminate the consent decree. Thus, applying the "four corners" rule of *Armour,* it would appear that the standard set forth in Part XI applies.

■ An argument can be made that under contract theory, Cyanamid and the Government, who are parties to the decree,[6]

**6.** Cyanamid contends that a consent decree confers no enforceable rights on a third party, even though the third party was intended to benefit by the decree, citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975). However, in this instance, where the standard set forth in Part XI tracks the language of Section 7 and MCI has been granted party status as an intervenor, the rule against enforcement by third parties does not apply since, as an intervenor, MCI will be barred under the doctrines of res judicata and collateral estoppel from relitigating issues decided or which could have been raised in this action. *Boys Town, U.S.A., Inc. v. World Church,* 349 F.2d 576, 577–78 (9th Cir.1965), *cert. denied,* 383 U.S. 910, 86 S.Ct. 894, 15 L.Ed.2d 665 (1966); *Federal Procedure, Lawyers Edition* § 51.207 (E. Barbre ed. 1981); 1B J. Moore, T. Currier, *Moore's Federal Practice* ¶ 0.411[1], at 1253 (1965). Its arguments under Section 7 therefore should be given full consideration by this court.

should be allowed to modify the decree by agreement. However, while it is generally true that contract law provides that parties to a contract may, by agreement, subsequently modify the contract without court approval, *Swift & Co.*, 1975–1 Trade Cas. (CCH) ¶ 60,201, at 65,702, this is not the case with respect to consent decrees, since modification thereof always requires court approval due to their quasi-judicial nature. Such approval would be meaningless if the court were to serve merely as a rubber stamp of modifications agreed to by the parties. Consequently, it is appropriate for the court to look beyond the words of the decree itself in situations such as this, where the parties jointly seek a modification of the decree.[7]

In performing this quasi-judicial role, the court must, of course, consider protection of the "public interest." We note, however, that the "public interest" should be based on more than a broad and undefined criterion such as promotion of the public welfare. Rather, "the words [should] take meaning from the purposes of the regulatory legislation," *NAACP v. FPC*, 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976)— here, the Sherman Anti-Trust and Clayton Acts.

The government's complaint herein alleged violations of Sections 1 and 2 of the Sherman Anti-Trust Act and Section 7 of the Clayton Act. The complaint charged that Cyanamid unlawfully allocated and monopolized the domestic and foreign markets for melamine and products containing melamine through leadership of an international cartel of melamine producers, its exclusive control and manipulation of mela-

mine technology and Dicy, and its acquisition of Formica Co. in 1956, which was and continues to be the principal domestic user of melamine to produce laminates. Had the government's allegations been proven at a trial, far more extensive relief than that prescribed in the decree would likely have been directed, e.g., divestiture is not uncommonly the appropriate relief when a Section 7 violation is proven. *Ford Motor Co. v. United States*, 405 U.S. 562, 573, 92 S.Ct. 1142, 1149, 31 L.Ed.2d 492 (1972). Judge Brieant found that "[t]he consent decree itself was formulated so as to dissolve Cyanamid's monopoly of the United States melamine industry and encourage the entrance of new producers into the domestic melamine market." 1982–83 Trade Cas. (CCH) ¶ 65,152, at 71,535.

■ Within this context, it appears that the purpose of Part XI was to nullify any tendency which Cyanamid's acquisition of Formica Co. would have to lessen competition or create a monopoly. We conclude that the standard set forth in Part XI, which tracks the language of Section 7, is the appropriate standard even when we look beyond the "four corners" of the decree and consider Part XI in the context of the original allegations. Here, the "public interest" derives meaning specifically from the Clayton Act, and so, the criteria used for determining a Clayton Act violation are applicable here for determining the "public interest."

We conclude that here the result is the same under either the four corners theory or the quasi-judicial theory. As noted above, the language within the four corners of Part XI clearly indicates that the Section

---

7. We note that this court's interpretation of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (1976) (Tunney Act) is consistent with this reasoning. *In re International Business Machines Corp.*, 687 F.2d 591, 600 (2d Cir.1982). There, a panel of this court observed:

The Tunney Act was enacted in 1974 in response to the growing number of settlements by consent decree in actions filed by the Antitrust Division of the Department of Justice. Recognizing that "[t]he entry of a consent decree is a judicial act which requires

the approval of a United States district court," and fearing that courts were engaging in "judicial rubber stamping" of proposals submitted by the Justice Department, Congress determined that judicial approval should be based upon specific criteria to ensure that the settlement terms would serve the public interest.

(footnotes and citations omitted). Although, by its terms, the Tunney Act is not applicable to a termination proceeding, it provides useful guidance to the courts in deciding how modification procedures should be addressed.

7 standard is applicable even if we look beyond the four corners in our quasi-judicial role.

## C. *Application of Section 7 Standard*

In applying the "public interest" standard, the district court herein stated that it was implicitly giving "careful consideration [to] whether termination of the Provision XI captive customer requirement will substantially lessen competition or tend to create a monopoly," since "[t]ermination of an antitrust Consent Decree in any industry, which may create a monopoly or lessen competition, does not serve the public interest." 1982–83 Trade Cas. (CCH) ¶ 65,152, at 71,540.

It was the intent of Congress that Section 7 of the Clayton Act should apply to vertical mergers and proscribe those which are anticompetitive. Indeed, the 1950 amendment to the Act and the legislative history of that amendment made clear that vertical mergers are covered. H.R.Rep. No. 1191, 81st Cong., 1st Sess. (1949) *reprinted in 1950 U.S.Code & Ad.News* 4293; *see United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 592, 77 S.Ct. 872, 876, 1 L.Ed.2d 1057 (1957).

The Supreme Court and this court have provided standards for determining whether a vertical merger is violative of the Clayton Act. In *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court set forth factors to be considered by a court in determining whether a vertical merger would violate Section 7. The Court noted that "[t]he primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a " 'clog on competition' which 'deprive[s] . . . rivals of a fair opportunity to compete.' " *Id.* at 324, 82 S.Ct. at 1523 (citation and footnote omitted). An initial step in determining whether such foreclosure constitutes a violation of Section 7 is to determine the relevant markets and the market shares of the acquiring and acquired firms' shares in those markets. The *Brown Shoe* Court stated: "If the share of the market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of course, have been violated. . . . On the other hand, foreclosure of a *de minimis* share of the market will not tend 'substantially to lessen competition.' " *Id.* at 328–29, 82 S.Ct. at 1525–26. If, however, the share falls between these extremes, a number of factors must be considered, which this court summarized in *Fruehauf Corp. v. FTC,* 603 F.2d 345, 353 (2d Cir.1979):

> [T]he nature and economic purpose of the arrangement, the likelihood and size of any market foreclosure, the extent of concentration of sellers and buyers in the industry, the capital cost required to enter the market, the market share needed by a buyer or seller to achieve a profitable level of production (sometimes referred to as "scale economy"), the existence of a trend toward vertical concentration or oligopoly in the industry, and whether the merger will eliminate potential competition by one of the merging parties.

*Fruehauf* added several other factors to the list as well: "the degree of market power that would be possessed by the merged enterprise and the number and strength of competing suppliers and purchasers, which might indicate whether the merger would increase the risk that prices or terms would cease to be competitive." *Id.* The *Fruehauf* court characterized this list as "the standard framework for analysis of the legality of a vertical merger." *Id.*

Here, the district court did not apply this standard framework of analysis to the case at bar in order to determine whether Part XI should be terminated. Instead, it stated that " '[c]ontemporary economic theory' recognizes that vertical integration may foster corporate efficiency and *enhance* competition in the market place," 1982–83 Trade Cas. (CCH) ¶ 65,152, at 71,539, and deferred to the judgment of the Department of Justice. Thus, we do not have the benefit of an analysis of record data regarding such

factors as the level of concentration, barriers to entry, scale economies, minimum efficient scale, or collusion. These are among the factors discussed in the government's 1982 merger guidelines, which can be helpful to the court in analyzing the legality of a vertical merger.[8]

The district court stated that "the Executive Branch of Government has broad discretion in controlling and determining the public's interest in Government antitrust litigation; a policy interest different from that of this court. Absent abuse of discretion, the Government's conclusion that a decree should be vacated should be given great weight." *Id.* at 71,540 (citation omitted). The district court then found that the Department of Justice had carefully examined the contentions of the participants, and had fulfilled its obligation to represent the public interest.

While *Brown Shoe* and its progeny have been the subject of considerable criticism by academicians who believe these cases apply overly harsh standards in assessing the legality of vertical mergers,[9] these cases nonetheless continue to constitute the current state of the law as prescribed by the Supreme Court, which circuit and district courts are bound to follow.

 We believe it was error to apply "contemporary economic theory" to the extent it may be distinct from precedent, and to fail to apply the standard framework of analysis, as discussed *supra.* We therefore reverse the decision of the district court insofar as it holds that "the conditions which the decree was designed to remedy no longer exist [and] the decree should be terminated," and we remand for the district court to apply the factors for analyzing the legality of a vertical merger set forth by *Brown Shoe, Fruehauf,* and other applicable cases, and to make findings of fact as to the current state of the melamine market and the market for products that contain mela-

mine. The court's findings and conclusions then may be reviewed, if need be.

Upon remand, the district court may conclude that no Section 7 violation presently exists. Should this be true, and should the district court continue to believe that a phase-out would be appropriate, the court should exercise its equitable power to determine an appropriate duration for such a phase-out. As noted by the Supreme Court in *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944): "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." Difficulty in rendering judgment may only rarely be a sufficient reason for a court of equity to refuse to exercise its equitable powers, and is not a sufficient reason upon the facts of this case to justify a refusal herein. Indeed, we cannot help but note that abrupt termination of Part XI without a phase-out period is in itself an exercise of equitable power.

## III. CONCLUSION

For all of the reasons set forth above, we affirm the district court's grant of MCI's motion to intervene permissively, reverse the district court's ruling that a "public interest" standard for determining whether to terminate is applicable, and remand to the district court for further proceedings not inconsistent herewith.

---

**8.** United States Department of Justice Merger Guidelines 44–52 (June 14, 1982).

**9.** *E.g.,* IV P. Areeda & D. Turner, *Antitrust Law* ¶¶ 1000–1019 (1980); R. Bork, *The Antitrust Paradox* 225–45 (1978); Y. Brozen, *Concentration, Mergers, and Public Policy* 402–04 (1982).